**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(KANSAS CITY)**

| | |
|---|---|
| KATHRYN LASK, | ) |
| | ) |
|        Plaintiffs, | ) |
| v. | )    **Case No.: 2:23-cv-2074** |
| | ) |
| THE BOARD OF TRUSTEES | ) |
| OF KANSAS CITY KANSAS COMMUNITY | ) |
| COLLEGE et. al. | ) |
| | ) |
|        Defendant. | ) |

## COMPLAINT

COMES NOW, Plaintiff Kathryn Lask ("Plaintiff" or "Lask"), by and through her counsel of record, and for her claims against Defendant Board of Trustees of Kansas City Kansas Community College ("Defendant" and/or "Defendant Board"), states the following:

## PARTIES

1.     Plaintiff Kathryn Lask is an adult female and a Kansas resident, residing in Overland Park, Johnson County, Kansas. At all times relevant, Plaintiff was and is an employee of Defendant Board of Trustees of Kansas City Kansas Community College ("KCKCC").

2.     Defendant Board is the Board of Trustees for KCKCC, which is a public community college organized under the laws of Kansas, has been authorized to conduct business in the State of Kansas, and Defendant Board performs all their duties and obligations at the principal place of business at KCKCC located at 7250 State Ave., Kansas City, Kansas 66112; additionally, by and through KCKCC, Defendant Board receives federal financial assistance. Defendant Board may be served at its aforementioned address by serving its chief executive officer pursuant to Fed.R.Civ.P. 4(j)(2), or "the clerk or secretary or, if not to be found, … any officer, director or manager" of KCKCC pursuant to K.S.A. § 60-304(d)(4).

1

3.      KCKCC is an employer under Title VII of the Civil Rights Act, in that it employs fifteen (15) or more employees and uses means of interstate commerce. 42 U.S.C. § 2000(e)(b).

4.      At all relevant times, Plaintiff was within the class of persons protected by Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e), *et seq*.

5.      Plaintiff is a current employee of KCKCC who has been harassed and discriminated against during her employment at KCKCC on the basis of her gender and in retaliation for complaining about discriminatory practices.

6.      Plaintiff alleges that KCKCC has violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*., as amended by the Civil Rights Act of 1991 ("Title VII").

7.      KCKCC is an employer under Title I and Title V of the Americans with Disabilities Act, in that it employs fifteen (15) or more employees and is a public institution.

8.      At all relevant times, Plaintiff was within the class of persons protected by Title I and Title V of the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq*.

9.      Plaintiff is a current employee of KCKCC who has been discriminated against during her employment at KCKCC on the basis of her disability and in retaliation for complaining about discriminatory practices.

10.     Plaintiff alleges that KCKCC has violated Title I and Title V of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et seq*. ("ADA").

11.     KCKCC is an employer under the Age Discrimination in Employment Act, in that it employs twenty (20) or more employees and is a public institution.

12.     At all relevant times, Plaintiff was within the class of persons protected by the Age Discrimination in Employment Act.

13.     Plaintiff is a current employee of KCKCC who has been harassed and discriminated against during her employment at KCKCC on the basis of her age and in retaliation for complaining about discriminatory practices.

14.     Plaintiff alleges that KCKCC has violated the Age Discrimination in Employment Act ("ADEA").

15.     KCKCC is an employer under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, in that it is a public institution and receives federal financial assistance.

16.     At all relevant times, Plaintiff was within the class of persons protected by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

17.     Plaintiff is a current employee of KCKCC who has been harassed and discriminated against during her employment at KCKCC on the basis of her gender and in retaliation for complaining about discriminatory practices.

18.     Plaintiff alleges that KCKCC has violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX").

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws and treaties of the United States.

20.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the

jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

21.     Further, this Court has jurisdiction pursuant to 28 U.S.C. § 1367 as it has original jurisdiction over this matter as outlined above.

22.     Plaintiff brings this action to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as more fully set forth herein.

23.     This is also an action to redress the deprivation of Plaintiff's Constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

24.     Venue is proper under 28 U.S.C. § 1391(b) because all parties reside in this judicial district and the events giving rise to the claims asserted herein occurred within the district.

## ADMINISTRATIVE/PROCEDURAL PROCEEDINGS

25.     Plaintiff filed a timely charge of discrimination dually filed with the Kansas Human Rights Commission/Equal Employment Opportunity Commission (EEOC) on July 6, 2022.  A true and accurate copy of the charge is attached hereto and incorporated herein by reference as *Exhibit A.*

26.     Plaintiff thereafter received her Notice of Right to Sue on her filed charge, dated February 08, 2023.  A true and accurate copy of each Notice is attached hereto and incorporated herein by reference as *Exhibit B.*

27.     This action has been timely filed with this Court and Plaintiff has fully complied with all administrative prerequisites before filing this action.

28.     Additionally, on August 31, 2022, Plaintiff filed a stipulation of dismissal of her first lawsuit against KCKCC.

29.     Pursuant to K.S.A. 60-518, Plaintiff has timely filed within the six (6) month deadline to refile.

**FACTS COMMON TO ALL COUNTS**

30.     At all times material, Defendant was and is receiving federal funding, as contemplated by Title IX, 20 U.S.C. § 1681, *et seq.*

31.     KCKCC has employed Plaintiff from 1992 to present.

32.     Defendant implemented and executed policies and customs in regard to the events that resulted in the deprivation of Plaintiff's constitutional, statutory, common law, and contractual rights.

33.     Defendant is responsible for ensuring that all their employees are properly qualified, trained and supervised to perform their jobs.

34.     Defendant is responsible for the acts and omissions of its employees.

35.     At all times material, Plaintiff was and is a female, single mother, and employee of Defendant with tenure.

36.     Plaintiff earned her Bachelor of Arts in Human Resources from the University of Kansas in 1989.

37.     In 1992, Plaintiff received her Juris Doctor from the University of Kansas School of Law.

38.     Plaintiff began working for KCKCC in 1992 as an adjunct Professor for the Business Division, was hired as a full-time 182-faculty[1] member in August 1993, and has been continuous employed by KCKCC since that time.

---

[1] 182-faculty are full-time faculty members who are employed pursuant to the Master Contract, as mentioned below.

39.     Plaintiff currently coordinates the KCKCC Paralegal Program, which is under the academic division of Social and Behavioral Sciences & Public Services (sometimes referred to as "Social Science Division").

40.     At all times during her employment, because of her experience and education in law, Plaintiff has been qualified to teach all Paralegal courses, Business Law I and II, and all law courses in the Criminal Justice program.

41.     In May of 2018, because of reorganization of KCKCC, Plaintiff learned that the Paralegal Program was being moved back to the Social Science Division from the Business Division.

42.     In August of 2018, Cleon Wiggins ("Wiggins") became Plaintiff's supervisor as Dean of Social and Behavioral Sciences & Public Services.

43.     Upon information and belief, Wiggins does not have a Juris Doctor degree or any experience in the legal field.

44.     In June of 2018, before Wiggins became Plaintiff's supervisor (but knowing he soon would become her supervisor), Plaintiff initiated a meeting with Wiggins to discuss a plan of action because Plaintiff had personal issues regarding challenges with picking up her children as a single mom.

45.     Plaintiff requested this meeting to explain her situation and assure Wiggins that she was committed to her work, but also to inform him there were some personal situations that she could not avoid.

46.     During this meeting, Wiggins was very kind and understanding and seemingly wanted to assist Plaintiff in making sure she could effectively perform the duties of her job while allowing her to attend to her personal needs as a single mother.

47.     Additionally, Plaintiff shared details of efforts already made toward effectuating potential changes to improve the Paralegal Program (sometimes referred to as the "Program") enrollment, including changes recommended by the Paralegal Advisory Board, to get Wiggins' feedback and support; specifically, Plaintiff suggested a new name for the Program as well as taking advantage of SB155's opportunities by offering classes in the local high schools.

48.     Wiggins acknowledged the recommendations in an email to Plaintiff on June 20, 2018.

49.     During the convocation meeting for the Spring 2019 semester, Plaintiff learned of an emergency situation involving her youngest son and took leave to attend the emergency.

50.     Two weeks later, Plaintiff was informed of another situation involving her middle child.

51.     Plaintiff knew the challenges with her children would be continuing in nature and inquired with her Kansas National Education Association ("KNEA") union representative and the College Human Resources department ("HR") regarding her options with the Family Medical Leave Act or other leave to minimize her obligation on campus allowing her to give proper attention to her children.

52.     None of the leave options presented would allow Plaintiff to continue being paid during such leave time, and as a single mother, foregoing pay was not possible.

53.     Therefore, Plaintiff informed her supervisor, Wiggins, she would likely be exercising paid leave on a more frequent basis, but Plaintiff assured Wiggins that she was committed to her position at KCKCC.

54.     Further, Plaintiff disclosed to Wiggins extremely personal information regarding her children and the nature of the situation which would warrant her not spending extra time on campus for the foreseeable future.

### Assignment to Program Review Committee

55.     Approximately three weeks after this meeting and conversation with Wiggins, i.e., her request for accommodation, Wiggins assigned Plaintiff to an additional committee on campus, the Program Review Committee.

56.     At the time Wiggins assigned Plaintiff to the Program Review Committee, she was already involved with one other campus committee that typically met once per month. There was no contractual requirement that tenured professors be assigned to committees, or more than one committee.

57.     The Program Review Committee held meetings on Wednesday afternoons at 2:30, one to two times per month for up to two hours.

58.     Unfortunately, 2:30 was the time Plaintiff needed to leave to pick up her youngest son from school and Wiggins understood this.

59.     Moreover, the Program Review Committee was the only committee that reports attendance to the deans because most of the attendees are tech staff who are on duty during the duration of this committee meeting and otherwise would be working at their desks; as a faculty member, Plaintiff's contractual time requirements are different and not hourly in nature.

60.     Plaintiff objected to being assigned to this specific committee and reminded Wiggins of their conversation and of her challenges at home which would require her to exercise more paid leave options; additionally, Plaintiff inquired if there was another committee she could join that met at a time whereby she could still be available for childcare for her children.

61.     Regardless of Plaintiff's objections and reasons thereto, Wiggins insisted that Plaintiff sit on the Program Review Committee, stating it would be good for her because the upcoming year required completion of a self-study from the Program.

62.     Under the MASTER CONTRACT Between THE BOARD OF TRUSTEES Kansas City Kansas Community College and THE FACULTY ASSOCIATION OF KNEA Kansas City Kansas Community College (the "Contract"), committee meetings are not specifically required for faculty members, but Wiggins required Plaintiff to attend regardless.

63.     Since such meetings are not required of faculty, if Plaintiff could not attend the meeting, she could not take leave because no contractual leave applied.

64.     Knowing her obligations to her children, Plaintiff met with the committee chairperson to explain the situation and the need for her to care for her children, and he assured her that she could review the minutes for the meetings and the minutes would be sufficient for any preparation for the self-study of the Program during the upcoming year.

65.     Plaintiff attended the committee meeting infrequently but read the minutes and prepared the self-study for the Program and submitted it on time in May 2020.

66.     After Plaintiff's submission of the self-study for the Program in May 2020, which was the reason Wiggins told Plaintiff she was to sit on the Program Review Committee, it was her understanding that her service to this committee was complete and she therefore discontinued such service.

67.     In October 2020, the Program self-study was peer reviewed via Zoom meeting and during the meeting, Plaintiff was present to engage in discussion and questioning.

68.     During the meeting, Plaintiff was questioned regarding statements she made in the self-study specifying challenges with the Program and Plaintiff responded that she was in need of administrative support to go forward with the advisory committee recommendations.

69.     Plaintiff went on to explain that (1) she began discussing a plan for progressing the Program with her dean in June 2018 and that those discussions were continuing; (2) that she needed her dean's assistance in approving class offerings at the high school; and (3) she needed her dean's assistance to attain alignment with Kansas Board of Regents' (sometimes referred to as "KBOR") 60-credit hour recommendations for associate programs (which required approval through the Academic Policies Committee), but she had yet to receive such support or assistance.

70.     Unbeknownst to Plaintiff, Wiggins was on the Zoom meeting the entire time.

71.     At the subsequent coordinator and division meeting, Wiggins asserted that, while he was "not naming any names" of people who tried to blame lack of program success on him, those people would "not get the desired help" and "would not be happy" about the repercussions.

72.     Plaintiff heard this statement as a veiled threat directed solely toward her.

73.     In December 2020, Wiggins scheduled a disciplinary Zoom meeting to discuss Plaintiff's failure to attend Program Review Committee meetings, claiming that she was being insubordinate by her failure to attend.

74.     Wiggins prepared a Letter of Reprimand to be placed in Plaintiff's HR file for what he claimed to be insubordination.

75.     During the meeting, Plaintiff explained to Wiggins that it was her understanding that her service involving the Program Review Committee ended in May after she submitted her self-study for the Program.

76.     Additionally, Plaintiff reminded Wiggins that she was willing to participate in other committees with different meeting times, that she had no intent of insubordination, and was fully intent on and committed to fulfilling her obligations under the Contract, which did not require her to sit on any committees.

77.     Plaintiff further inquired as to Wiggins' procedures for assigning faculty to committee assignments rather than allowing faculty to volunteer as was Plaintiff's experience with all previous supervisors at KCKCC, and she further inquired about other committee meeting times, and who else Wiggins had assigned to serve on committees, because, as to Plaintiff's knowledge, no other coordinators in the division have been assigned committees.

78.     Wiggins responded that he would not "go down that rabbit hole."

**Wiggins plan to move faculty offices.**

79.     In June of 2019, during summer break, Wiggins sent an email to faculty requesting feedback on his plan to move several faculty offices.

80.     As Plaintiff had moved offices several times over the years and is one of the most senior faculty members on campus, and such seniority used to mean something before Wiggins became dean, Plaintiff objected to the plan proposed and offered an alternative solution that achieved his stated objective.

81.     Wiggins refused to engage in discussion and asserted that his plan was best.

82.     A couple of months later, in August of 2019, Plaintiff had a meeting with the now former Vice President for Academic Affairs ("VPAA"), BethAnn Krueger, whereby she discussed her issues with the office moves and relayed how Wiggins' behavior was creating a hostile environment in which Plaintiff, as a female and single mother, felt singled out and targeted.

83.     Additionally, Plaintiff told the VPAA that the proposed office move would place her office directly adjacent to Wiggins' office which made her uncomfortable and anxious as she believed such an office location would subject her to further discriminatory treatment by Wiggins.

84.     The VPAA said she would look into the situation but later followed-up by email suggesting Plaintiff talk with HR and did nothing.

85.     Pursuant to the VPAA's suggestion, Plaintiff scheduled a meeting with the faculty liaison and **Title IX Coordinator**, Sean Burkett, whereby she reported the hostile work environment to Sean Burkett, and again, nothing was done.

86.     During the first week back on campus, Wiggins insisted that Plaintiff pack up her office for the Fall 2019 semester.

87.     After Plaintiff consulted her KNEA representative, who assured Plaintiff that Buildings and Grounds staff were the appropriate personnel to move the office, Plaintiff packed up her personal belongings and went to a nearby common area on campus to make herself available to students during the move.

88.     Plaintiff then received an email from Wiggins asserting that Plaintiff did not have permission to work outside of her office, despite the fact the Contract does not specify where faculty members must spend their contracted hours and despite the fact that 182-faculty have had the freedom to move about campus at their own discretion during the entirety of Plaintiff's career at KCKCC.

89.     Thereafter, in September of 2019, Wiggins scheduled a disciplinary meeting asserting that Plaintiff was insubordinate by not packing up her office, and Wiggins went as far as presenting pictures of Plaintiff's previous office with books on the shelves as evidence of such insubordination.

90.     When office moves actually occurred, Wiggins arbitrarily moved a male faculty member from the same office suite as Plaintiff into Plaintiff's previous office, giving preferential treatment to the male faculty member, despite Plaintiff having many more years of seniority.

91.     Plaintiff had a KNEA representative, Ernie May, accompany her to the disciplinary meeting and the representative informed Wiggins that faculty members are not hired to be movers and the Contract did not require or suggest faculty engage in such activity.

92.     Moreover, during this meeting Plaintiff attempted to address the issues surrounding her attempt to communicate directly with Wiggins regarding various faculty obligations and efforts and how Plaintiff felt the tone and substance of Wiggins' emails came off hostile, harassing, and discriminatory, and caused Plaintiff anxiety.

93.     Upon hearing Plaintiff's feelings, Wiggins rose up out of his chair and demanded Plaintiff show him the emails, to which Plaintiff replied that since he was on all of the email chains, he had access to the emails.

94.     After this meeting, Plaintiff's KNEA representative, who had witnessed the exchange between Wiggins and Plaintiff, urged Plaintiff to file a Title IX action, or at the very least, a grievance.

95.     Further, the KNEA representative suggested that several women in the Social Science division had reached out to him having the same or similar concerns as Plaintiff regarding Wiggins' disparate treatment against the women in the department.

96.     After this exchange with the KNEA representative, Plaintiff considered taking such actions, but feared retaliation and increased threats from Wiggins.

**Class cancellations and coordinator issues.**

97.     In January 2019, Plaintiff asked Wiggins to add the Internship I and II courses to the spring schedule to accommodate a paralegal student who needed the classes to graduate and recently found a sponsor for her internship.

98.     Wiggins objected to the student's concurrent enrollment in both internships, despite Plaintiff explaining that the student's internship would be continuous with one sponsor and the student would be able to complete all required course hours.

99.     Wiggins refused to acknowledge Plaintiff's previous extensive experience and refused to consider the fact that previous deans had all deferred to her education and experience and approved such a course of action.

100.    All previous deans would regularly defer to Plaintiff's expertise and experience as a practicing attorney and program coordinator who works directly with the students.

101.    Wiggins, with no legal education or experience, gave no actual, practical reason for not adding the course, but mentioned "policies" without referring to specific policies.

102.    Additionally, Wiggins stated a degree audit must be completed before enrollment in internships, yet this has never been policy or practice in the past and Wiggins gave no reason as why it was necessary.

103.    Wiggins does not behave in the same fashion with Plaintiff's male counterparts and regularly defers to their education and experience, allowing them to run their programs as they see fit.

104.    Additionally, in 2019, Plaintiff was scheduled to teach four 8-week courses for the Paralegal Program; two were to begin in January and two were to begin in March, after spring break.

105.    Even though the courses were experiencing low enrollment and were in danger of being cancelled, after Plaintiff's advocation for her students who were scheduled to graduate in May, Wiggins approved the courses to continue.

106.    As Plaintiff was advocating for her students and Wiggins subsequently made the decision to approve the courses to continue, Plaintiff explained to Wiggins that the students taking the first 8-week courses would also be taking the second 8-week course, therefore enrollment in the second 8-week courses would be low as well.

107.    Wiggins indicated he understood the second 8-week courses would not have additional enrollment.

108.    Yet, during spring break, when Plaintiff was off duty, she received an email from Wiggins stating the second 8-week courses were going to be cancelled.

109.    Plaintiff, during her time off, replied to Wiggins by forwarding email communication from January whereupon Plaintiff believed this situation had been resolved and reminded Wiggins that if the classes were cancelled the students would not graduate in May.

110.    Wiggins responded by inquiring if degree audits were on file for the students and after Plaintiff's investigation, she discovered no audits were on file because the graduation check (when degree audits needed to completed) deadline was not until April.

111.    Plaintiff shared with Wiggins the graduation check deadline and he continued to insist that the courses would be cancelled without the "degree audit proof."

112.    Plaintiff contacted an advising staff member (as staff members do not have a scheduled spring break like faculty) to see if she could prepare degree audits for the students as Plaintiff was on spring break in Florida.

113.    As it turned out, the staff member was on vacation that week as well, so Plaintiff having no other choice to advocate for her students, prepared the degree audits herself, sent them to Wiggins and renewed her request he not cancel the courses.

114.    Upon receiving the degree audits evidencing the students' May graduation date and Plaintiff's renewed request, Wiggins still cancelled the courses within days of their being set to begin.

115.    Plaintiff continued to request Wiggins reinstate the courses, especially after receiving panicked emails from the students about not being able to graduate.

116.    Wiggins initially refused, but then required the advising staff member to send him the same degree audit documentation showing the students' expected May graduation as Plaintiff had previously sent him.

117.    Prior to Wiggins requiring the information from the advising staff member, Wiggins had never requested the advising staff member get involved; Plaintiff requested her assistance because Plaintiff was on vacation.

118.    Wiggins basically used the advising staff member, who has no supervisory authority over Plaintiff or the Paralegal Program, to check and affirm Plaintiff's work.

119.    Only after the advising staff member checked and affirmed Plaintiff's work did Wiggins reinstate the courses allowing the students to graduate in May.

120.    After this situation, Plaintiff scheduled a meeting with Wiggins to discuss his objective and rationale for cancelling the courses despite her producing the requested documentation to him during spring break.

121.    Wiggins responded by insisting Plaintiff agree there "had never been a problem between us, Kathryn" and that "I probably should have just called you. I'm not really good at email."

122.    Additionally, Plaintiff scheduled another meeting with the faculty liaison in Human Resources to discuss the multiple problems Wiggins was presenting.

123.    The Human Resources staff member suggested there were simple miscommunication issues and Wiggins had done this several times.

124.    The Human Resources staff member dismissed Plaintiff's concerns that Wiggins' behavior was problematic, and that Wiggins was creating a hostile work environment for female faculty in the Social Science division.

125.    Instead of investigating, the HR staff member dismissed any type of wrongdoing alleged by Plaintiff, who, in all her years being employed by KCKCC has never reported sexual harassment and/or discrimination against another employee.

126.    In the Spring of 2020, a similar situation occurred with internship courses. Students found internships at the beginning of the semester, but Wiggins claimed it was too late to add them to the full semester classes.

127.    Yet, Wiggins has the *discretion* to add the students to the full semester classes.

128.    Instead, Wiggins agreed to add the courses to the second 8-week term starting March; yet, in March, he *cancelled* the internships for low enrollment.

129.    Wiggins continues to cancel the internships, which only serves to damage Plaintiff as she is paid *per student* and there is *no minimum* enrollment in internships.

130.    Now, Wiggins argued that the students shouldn't be enrolled in both internships despite having agreed to the same situation with the students in January.

131.    Wiggins refused to even engage in further conversation regarding this issue and both his and the preceding deans' previous practice.

132.    Wiggins continues to undermine Plaintiff's position as the Paralegal Program coordinator and her relationships with the students.

133.    Additionally, Wiggins refuses to engage in discussion and instead, becomes loud, demanding, and standoffish.

134.    Furthermore, in the Spring of 2020, Wiggins objected to Plaintiff's class offerings, again, with no legal background or experience.

135.    Yet, Wiggins never questions male colleague's expertise and experience in deciding and planning which classes to offer.

### Assigning night classes.

136.    In the Fall of 2019, Wiggins required Plaintiff to schedule a night class even though paralegal night classes have not made minimum enrollment since the early 2000's.

137.    Plaintiff complied with the request and scheduled a night class naming a previous paralegal adjunct instructor as the instructor for the night class.

138.    Wiggins objected to the adjunct being named the instructor and informed Plaintiff that she needed to post the job.

139.    Again, Plaintiff complied with Wiggins' request only to have Wiggins object to the job requirements posted with no explanation.

140.    Plaintiff repeatedly asked for direction, was not given any, and was eventually assigned to instruct the course by Wiggins.

141.    Plaintiff again reminded Wiggins of her family obligations as a single mother and stated that she was unable to teach a night class; Plaintiff even forwarded to Wiggins the communication regarding the adjunct request.

142.    Wiggins failed to even respond to Plaintiff, ignoring her requests and obligations as a single mother.

**Wiggins' affirmative efforts to discourage and halt Program improvements and proposed changes to comply with KBOR recommendations.**

143.    Additionally, in the Fall of 2019, Plaintiff was voicing her frustration stemming from the lack of assistance from Wiggins regarding: (1) moving forward with getting the Paralegal Program into area high schools to take advantage of SB 155 provisions that would push more traditional students into the Program; and (2) moving forward with the changes to the Program to make it more accessible with respect to course offerings as well as to comply with KBOR recommendations to have 60 maximum credit hours for Associate Degrees as the Program was no closer to achieving either objective than when Plaintiff first mentioned the objectives to Wiggins in June 0f 2018.

144.    As Plaintiff voiced such frustrations, a male colleague, who is also in the Social Science division and sits on the Academic Policies Committee ("APC") informed Plaintiff she could ask Wiggins to present the changes to the Dean's Council so that Plaintiff could in turn present them to APC for advice.

145.    The behavior displayed at division meetings made clear that the male colleague and Wiggins had a very friendly and professional relationship and when the male colleague requested Wiggins present changes to his program to the Dean's Council, Wiggins willingly obliged.

146.    Plaintiff subsequently had in informal presentation at the APC and was given advice and direction on how to proceed with her proposed changes.

147.    Moreover, Plaintiff discussed the changes with the Paralegal Advisory Board, but because of the challenges surrounding COVID, a formal presentation to the APC was not possible until October of 2020.

148.    As October of 2020 approached, procedure required Wiggins present the changes to the Dean's Council before Plaintiff could make a formal presentation to the APC.

149.    Despite willingly agreeing to the male colleague's request on Plaintiff's behalf for APC review of her changes to the Program just a year prior, Wiggins refused to present Plaintiff's proposed changes to the Dean's Council, stating in an email that he did not agree with the changes despite his complete lack of any legal education or experience and Plaintiff's accompanying support of the Paralegal Advisory Board and their agreement with such changes.

150.    Wiggins further asserted that he had never been made aware of Plaintiff's desire to make changes, yet Wiggins and Plaintiff had a conversation regarding such changes in June 2018 and Wiggins engaged in email communication with Plaintiff regarding such changes beginning in February 2019 continuing through the fall of 2019.

151.    Because of Wiggins' refusal and affirmative action to keep Plaintiff's program from changing to comply with KBOR requirements, in September of 2021, Plaintiff's program became "broken," meaning students could not graduate from Plaintiff's program.

152.    Only once Plaintiff's program was broken, Wiggins agreed to assist with making necessary changes to comply with KBOR requirements.

**Refusal to honor law degree, teaching qualifications, teaching experience, previous practice, HLC policies, and the Contract**

153.    Again, in August 2019, one week before the semester began, course cancellations caused Plaintiff to be short of the required contractual teaching load under the Contract.

154.    The Contract provides for any full-time faculty member (such as Plaintiff) short on their teaching load to request to teach a course slated to be taught by an adjunct to meet the contractual required load.

155.    After consultation with the now former Criminal Justice Program Coordinator, Kevin Steele, Plaintiff requested Wiggins assign her courses within the Criminal Justice department for which she is qualified to teach, and which adjunct faculty were assigned.

156.    Wiggins refused to allow her to teach courses for which she was qualified and had taught before stating the Criminal Justice Program Coordinator was required to "make contractual load" before Plaintiff could request any classes within that program.

157.    Wiggins' statement does not align with the Contract nor is it factually correct as Mr. Steele was employed as a 212-faculty[2] member and did not have contractual load requirements whereas Plaintiff, employed as a 182 faculty member is contractually required to teach 30 credit hours per year.

158.    Plaintiff subsequently alerted her KNEA representative of Wiggins' statements and actions and included the VPAA of the discriminatory behavior by copying her on an email chain whereupon Plaintiff renewed her request to add the Criminal Justice courses to her teaching schedule pursuant to the Contract.

159.    Plaintiff was assigned the requested courses with no further communication from Wiggins.

160.    In the Spring of 2020, Plaintiff again taught Criminal Justice courses at Wiggins' request as the Criminal Justice Coordinator resigned and Plaintiff was qualified to teach such courses.

---

[2] 212-faculty are to have hours in which they are required to be campus at their work space, whereas, 182-faculty do not have the same requirements.

161.    In the Fall of 2020, Plaintiff again needed to pick up courses to meet her contractual load and requested to teach Criminal Justice courses again, as she has done her entire career at KCKCC.

162.    But, in the Fall of 2020, with a new Criminal Justice Coordinator who lacked tenure, Wiggins emailed Plaintiff with a new assertion that Plaintiff was not qualified to teach Criminal Justice courses, claiming she did not meet the Higher Learning Commission's ("HLC") qualifications and he supplied a lengthy analysis and explanation attacking Plaintiff's doctorate degree transcript and previous experience,[3] concluding that Plaintiff's education and experience did not support her being qualified to teach such courses.[4]

163.    Prior to the aforementioned email, there was no discussion and/or inquiry from Wiggins regarding Plaintiff's qualifications.

164.    The HLC policy statement cited by Wiggins states a faculty member is considered qualified to teach if the faculty member holds a "relevant" or "related" degree at least two degrees higher than the course being taught; so, a faculty member holding a doctorate may teach bachelor's degree courses or below.

165.    Thus, there is no need to do extensive research or evaluation on Plaintiff's transcript as she holds a juris doctor, a doctorate degree in law, which is both related and relevant to Criminal Justice.

166.    As such, Plaintiff replied to Wiggins' email objecting to the evaluation, citing the HLC policy and explaining why she is and always has been qualified to teach Criminal Justice courses.

---

[3] Wiggins only used Plaintiff's experience from 2018 forward in his evaluation, despite the fact Plaintiff has been employed by and teaching at KCKCC since 1992.
[4] The specific classes Plaintiff was requesting to teach, while Criminal Justice courses, are more related to law and legal theory than to corrections.

167.    Plaintiff copied the VPAA on her reply asserting objections yet nothing was done or said about the incorrect evaluation of Plaintiff's qualifications.

168.    Further, Wiggins claims that because her law school transcript did not reveal any Criminal Justice courses, she was not qualified.

169.    Plaintiff's law school transcript did however reveal that she took and passed Criminal Law and Criminal Procedure, but Wiggins did not see these courses as "relevant" or "related" because they are not "criminal justice" courses.

170.    Oddly, Plaintiff's law school transcript is devoid of any paralegal courses, but Wiggins never questioned her qualification for teaching those courses.

171.    Plaintiff objected multiple times to the notion she was not qualified as she has been teaching those courses for decades.

172.    In response to the incorrect evaluation, Plaintiff contacted her KNEA representative who reassured her that Wiggins' claim she was not qualified to teach Criminal Justice courses was incorrect.

173.    Plaintiff then scheduled a meeting with the interim VPAA, Jerry Pope, in hopes of obtaining support for enforcing the Contract and having her qualification to teach evaluated correctly.

174.    Prior to the meeting with Mr. Pope, Plaintiff spoke with the new coordinator of the Criminal Justice Program and inquired as to whether she would add Plaintiff's names to the courses and she agreed to tell Wiggins that Plaintiff could teach the requested Criminal Justice courses.

175.    During the meeting, the interim VPAA stated he would speak with the new coordinator about the issue, but no further communication was had and Plaintiff was not assigned the requested courses.

176.   In January of 2021, Plaintiff emailed Wiggins renewing her objections to his evaluation of her qualifications and attached a discovered document prepared by Ed Kremer, PH.D., a previous dean of Plaintiff, in anticipation of an upcoming HLC campus visit for continuing accreditation.

177.   The document specifically stated that Plaintiff holds a Doctorate degree in law and as such is qualified to teach all law classes at KCKCC,[5] including classes in the Paralegal Program, Business Law I and II, and Criminal Justice courses.

178.   As further support for her qualifications, Plaintiff mentioned the two previous Coordinators of the Criminal Justice Program continuously requested Plaintiff to teach courses in their program throughout her tenure and would not have done so if they believed Plaintiff was unqualified.

179.   Wiggins replied that the HLC document prepared by Dr. Kremer was not helpful or dispositive regarding Plaintiff's qualifications and further claimed – without support – that the previous coordinator, Mr. Steele, who continuously requested that Plaintiff teach Criminal Justice courses, did not believe Plaintiff was qualified.

180.   Interestingly, Mr. Steele held a bachelor's degree in Public Administration and Political Science and a Master of Public Administration, not in Criminal Justice, but Wiggins never conducted an evaluation of his education and experience to decide whether he was qualified to teach certain courses; instead, Wiggins just assumed Mr. Steele was qualified.

**Discriminatory treatment regarding discretionary decisions.**

181.   In August of 2021, the week prior to faculty return, the President of KCKCC communicated updated COVID protocols for the entire campus.

---

[5] KCKCC is a community college for which the highest degree conferred is an associates degree.

182.    With such protocols in place, Plaintiff made a doctor's appointment to document a medical condition and request an accommodation from the HR department.

183.    Additionally, the President sent a Convocation/Welcome Back agenda for the first week 182-faculty was to start work for the fall semester and the agenda showed all meetings for the week were being conducted virtually via Zoom or Teams.

184.    There was no mention of a requirement regarding where faculty were expected to attend the virtual meetings, as in previous semesters during COVID, and there was no communication from the division dean (Wiggins) regarding expectations that faculty be on campus during the week before classes.

185.    As such, Plaintiff believed there was still a desire to minimize personnel on campus, as evidenced by all meetings being conducted virtually and as had been the status quo since late spring 2020.

186.    On Wednesday, August 11, 2021, Wiggins communicated with Plaintiff that he expected her to be on campus.

187.    Plaintiff replied that she was waiting on a document from her doctor regarding an accommodation.

188.    But, because of Wiggins' communication, Plaintiff submitted sick leave requests for all her contracted time she could not prove attendance via Zoom sign in.

189.    Wiggins refused to accept Plaintiff's sick leave, instead challenging her submission and accusing her of using the time inappropriately and against sick leave policy, specifically claiming she was trying to account for the time she was not on campus rather than actually being sick.

190.    Plaintiff replied to Wiggins clarifying that she used her sick leave as she was waiting on medical documentation for her medical accommodation and she copied HR on that email to ensure HR would have notice of Wiggins' behavior singling Plaintiff out and harassing her.

191.    Wiggins replied, only to Plaintiff, leaving HR off the reply email, that he had already prepared a Letter of Reprimand, that HR had signed off on the letter, and Plaintiff was directed to schedule a meeting during the week of August 23, 2021, to discuss the letter.

192.    Plaintiff spoke with other 182-faculty in her department, none of which received direction regarding on-campus requirements from Wiggins or from administration.

193.    Additionally, none of the faculty in her division with whom she spoke were contacted by Wiggins regarding whether or not they were on campus.

194.    Furthermore, the 182-faculty members with whom Plaintiff spoke to stated they were working from home as further evidenced by their Zoom screen.

195.    Plaintiff attended a meeting to discuss the Letter of Reprimand on September 1, 2021, and when asked by Plaintiff's KNEA representative if Wiggins had inquired into other employees' whereabouts, Wiggins replied that he did not go looking to see of other employees were on campus.

196.    Plaintiff was issued the Letter of Reprimand, which again stated that she had been insubordinate.

197.    Notably, insubordination is one of very few ways to terminate a faculty member as faculty are well protected under the Contract from being arbitrarily terminated.

198.    Wiggins has now issued Plaintiff two Letters of Reprimand, neither of which involved clear policy or Contract violations, citing insubordination.

199.    Wiggins has never been disciplined for his sexual harassment/discrimination or his retaliation against Plaintiff.  Nor, upon information and belief, has he been counseled about his conduct in dealings with Plaintiff.

200.    Defendant's actions have impaired Plaintiff's ability to progress the Program and continue advancing in her career as a professor at KCKCC.

### Continued harassment through the HR Department of KCKCC.

201.    On August 27, 2021, Plaintiff received an email from Christina McGee, Chief Human Resources Officer of KCKCC, in which Ms. McGee stated:

202.    "***It was brought to the attention of the HR Department*** that your name and the College's address shows up on the Legal Directories website.  I am not certain if a third party added the College's address of if this is updated by you.  ***It has been requested*** that the College's address be changed to a personal or business address under your name.  If possible, will you update the profile by removing the College's address?"

203.    Beginning in 1992, when Plaintiff began working for KCKCC, she has been a licensed attorney and her address on file with the State Bar of Kansas has been KCKCC.

204.    Additionally, the email makes clear that the HR Department did not seek out this information, but that someone had reported such information to the HR Department.

205.    Furthermore, the email makes clear that it is not the HR Department requesting the address be changed on the Legal Directories website, but that the individual who reported the address to the HR Department in the first place also requested it be removed.

206.    It is clear someone was searching into Plaintiff, attempting to find unfavorable information because if her listing KCKCC's address was truly an issue, it would have been

requested that Plaintiff remove KCKCC's address from the State Bar of Kansas' website as well as AVVO's website (another legal directory).

207.   As of the filing of this Complaint, Plaintiff's address on the State Bar of Kansas' website as well as AVVO's website remains the address of KCKCC.

208.   Plaintiff has maintained her status as a licensed attorney for the benefit of KCKCC and prior to August 27, 2021, there has never been an issue with KCKCC's address being listed next to Plaintiff's status as a licensed attorney.

209.   Moreover, Plaintiff can be found on KCKCC's website under the Faculty and Staff Directory.

210.   Importantly, nearly every faculty and staff member listed on KCKCC's website can be found on a third-party website, such as zoom info, with KCKCC's address associated with them; this includes Christina McGee.

### Retaliation after filing her Complaint.

211.   On September 3, 2021, Plaintiff filed her first Complaint, pursuant to Title IX, 20 U.S.C. § 1681, for sex discrimination/harassment (hostile educational environment) and retaliation.

212.   Defendant was served on September 3, 2021; and thus, were put on notice of Plaintiff's claims under Title IX on the same date.

213.   On September 8, 2021, five days after Defendant was served and placed on notice, Wiggins required Plaintiff to attend a Zoom meeting.

214.    In that Zoom meeting, Wiggins informed Plaintiff that she was being demoted, stripped of her coordinator title, a title which Plaintiff has had for **29 YEARS** as a professor at KCKCC.[6]

215.    Wiggins stated that Plaintiff's demotion and stripping of her coordinator title took effect immediately.

216.    Further, Wiggins informed Plaintiff that her Program would be placed under the Criminal Justice Program, and that she would now be supervised by the coordinator with the least amount of experience/time in the Social Science Division and who is not tenured.

217.    Wiggins stated the reason for her demotion was that the change would be "better for students," yet Wiggins has a pattern of attempting to keep Plaintiff's students from graduating for arbitrary reasons, or no reason at all.

218.    When Plaintiff asked Wiggins how students would better be served by this change, or what about her performance makes this change better for students, he again replied with his common response that he would not go "down that rabbit hole."

219.    Notably, Wiggins indicated that Plaintiff's job duties would not change, but nonetheless, effective immediately, she would no longer adorn the title of coordinator and her course load has been affected.

220.    Plaintiff was the only vocational coordinator in the Social Science Division who was demoted and stripped of her coordinator title.

221.    Notably, KCKCC refuses to follow its own policies and procedures regarding Title IX complaints as it has not offered to support Plaintiff.

222.    As such, Plaintiff's office is still within the same pod as Wiggins.

---

[6] Notably, Wiggins did not further address Plaintiff's demotion, presumably pursuant to Plaintiff's Amended Complaint in her Title IX lawsuit previously filed and served on Defendants.

223.    Wiggins, knowing Plaintiff is uncomfortable and feels as if she is being harassed by him, continues to send harassing emails to Plaintiff demanding she work from her office even though the Master Contract does not require Plaintiff to work from her office.

224.    On or about February 7, 2023, Plaintiff informed Jerry Pope, again, that she was being harassed and discriminated by Wiggins.

225.    Plaintiff met with the HR supervisor, Christina McGee, and informed her that she would feel supported with an alternative supervisor; Plaintiff has not heard from Ms. McGee, the human resources department or the Title IX coordinator since her complaint was made.

226.    Since KCKCC has not offered to support Plaintiff or given her a new supervisor, she is not afforded the same benefits and support regarding her paralegal program as communication with Wiggins has diminished greatly.

227.    Moreover, because of the tension in the division, Plaintiff is not afforded the same benefits and support from other faculty members.

228.    Additionally, she is not afforded the same benefits and support because she does not feel comfortable using her office, therefore, she has to roam campus and find different areas to work.

229.    Wiggins has also resorted to intimidation tactics, such as escalating situations of little to no consequence, and standing around areas Plaintiff is known to work, areas that Wiggins has no reason to be.

**COUNT I**
**Title VII, 42 U.S.C. § 2000(e), *et seq*. – Gender Discrimination**

230.    The foregoing paragraphs are incorporated as though fully set forth herein.

231.    KCKCC intentionally engaged in unlawful employment practices against Plaintiff on the basis of her gender in violation of Title VII of the Civil Rights Act.

232.    In particular, Wiggins places more oversight on Plaintiff than on her male counterparts; refuses to recognize Plaintiff's seniority; halts or stalls progression of Plaintiff's program; requires Plaintiff to engage in activities her male counterparts are not required to do; refuses to recognize her experience and education and does not do the same with her male counterparts; issues Plaintiff letters of reprimand, which he does not do with her male counterparts; and demoted Plaintiff as to have more oversight and authority over her.

233.    Further, despite the fact that Plaintiff made multiple complaints that Wiggins was harassing and discriminating against her based on her gender, Defendant failed to act or support Plaintiff, or otherwise attempt to remedy the situation.

234.    Plaintiff is continuously treated differently, and less favorable, than her male counterparts by Wiggins and Defendant.

235.    As a direct and proximate result of Defendant's acts, actions, omissions, and failure to prohibit discriminatory practices produced by its agents and supervisors, Defendant violated Title VII of the Civil Rights Act and Plaintiff thereby suffered and continues to suffer damages as a result of Defendant's conduct in the form of lost income, humiliation, garden variety emotional distress, loss of dignity, and other damages.

WHEREFORE, Plaintiff seeks judgement in her favor and against Defendant, on Count I of the Complaint, in an amount that is just and equitable under the circumstances, including, but not limited to, Plaintiff's actual damages, exemplary damages, injunctive relief, and for all costs, expenses, witness fees and expenses and attorneys' fees incurred herein, and for such other relief as this Court deems just and proper.

## COUNT II
### Title VII, 42 U.S.C. § 2000(e), *et seq.* – Hostile Work Environment

236.    The foregoing paragraphs are incorporated as though fully set forth herein.

237.   Since Wiggins became dean of the Social Science Division, Plaintiff has been subjected to continuing and pervasive discriminatory treatment because she is a woman.

238.   Acts perpetrated by Defendant's supervisors and male peers that have drastically altered the conditions of her employment and create hostile work environment include, but are not limited to:

a.   Plaintiff's supervisors refuse to allow Plaintiff to make necessary changes to her program to comply with Higher Learning Commission standards, limiting her program growth and allowing her program to become broken. This practice continues to present day;

b.   Plaintiff's supervisors refuse to recognize her seniority, resulting in a less desirable office, and allowing a male colleague to obtain Plaintiff's desired office. This practice continues to present day;

c.   Plaintiff's supervisors refuse to recognize Plaintiff's education and experience, resulting in Plaintiff not being allowed to teach certain courses she is qualified to teach, which affects her pay. This practice continues to this day;

d.   Plaintiff's supervisors issue her letter of reprimand for failing to adhere to non-contractual demands not placed on her male counterparts, which are permanently placed in her employment file. This practice continues to this day;

e.   Plaintiff's supervisors are attempting to require her work from her office, next to her harasser, where they know Plaintiff is uncomfortable and experiences anxiety. This practice continues to this day.

f.   Plaintiff's supervisors micromanage Plaintiff's program, not affording her the freedom to use her education, experience, and judgment, which has resulted in

Plaintiff having to work extra, unpaid hours in order to ensure students are adequately taken care of and can graduate, in an effort to push her out. This practice continues to present day;

g.   Plaintiff's supervisors continue to treat her with express hostility because she is a woman and does not submit to general gender roles or expectations, e.g., submission. This practice continues to this day.

239.   Defendant is aware of the discriminatory treatment of Plaintiff at the hands of her supervisors and colleagues, but has not taken corrective action to prevent such treatment from occurring.

240.   Plaintiff has suffered garden variety emotional distress and physical manifestations of said injuries, all of a severe and progressive nature.

WHEREFORE, Plaintiff seeks judgement in her favor and against Defendant, on Count II of the Complaint, in an amount that is just and equitable under the circumstances, including, but not limited to, Plaintiff's actual damages, exemplary damages, injunctive relief, and for all costs, expenses, witness fees and expenses and attorneys' fees incurred herein, and for such other relief as this Court deems just and proper.

## COUNT III
### Title VII, 42 U.S.C. § 2000(e), *et seq*. – Retaliation

241.   The foregoing paragraphs are incorporated as though fully set forth herein.

242.   In 2019, 2021, and 2023, Plaintiff voiced her concerns to Defendant about her supervisor's unlawful discriminatory treatment of her as more fully described above.

243.   Defendant retaliated against Plaintiff when she complained about her supervisor's conduct by instructing or permitting Plaintiff to be subjected to disparate treatment, punitive oversight, and not affording her protections under its Title IX policy.

244. Plaintiff has also suffered garden variety emotional distress as a result of the actions of Defendant.

WHEREFORE, Plaintiff seeks judgement in her favor and against Defendant, on Count III of the Complaint, in an amount that is just and equitable under the circumstances, including, but not limited to, Plaintiff's actual damages, exemplary damages, injunctive relief, and for all costs, expenses, witness fees and expenses and attorneys' fees incurred herein, and for such other relief as this Court deems just and proper.

## COUNT IV
### Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. – Age Discrimination

245. The foregoing paragraphs are incorporated as though fully set forth herein.

246. Plaintiff was at all times material hereto an employee of Defendant within the meaning of the ADEA.

247. Plaintiff was at all times relevant over the age of 40 and within the class of persons protected by the ADEA.

248. Defendant was at all times relevant an employer within the meaning of the ADEA.

249. At all times relevant, Plaintiff was qualified for the positions held while employed by Defendant.

250. Plaintiff's age was a determining factor in Defendant's employment decisions regarding Plaintiff's compensation, terms, conditions, and privileges, including, but not limited to:

   a. Plaintiff's supervisors refuse to allow Plaintiff to make necessary changes to her program to comply with Higher Learning Commission standards, allowing her program to become broken in an effort to push her out. This practice continues to present day;

b.   Plaintiff's supervisors refuse to recognize her seniority, resulting in a less desirable office, and allowing a male colleague with less seniority to obtain Plaintiff's desired office. This practice continues to present day;

c.   Plaintiff's supervisors refuse to recognize Plaintiff's education and experience, resulting in Plaintiff not being allowed to teach certain courses she is qualified to teach, which affects her pay. Defendants can pay younger adjuncts less money to teach the same courses. This practice continues to this day;

d.   Plaintiff's supervisors issue her letter of reprimand for failing to adhere to non-contractual demands, which are permanently placed in her employment file, in an effort to show continuous insubordination and push her out. This practice continues to this day;

e.   Plaintiff's supervisors are attempting to require her work from her office, next to her harasser, where they know Plaintiff is uncomfortable and experiences anxiety, in an effort to push her out. This practice continues to this day.

f.   Plaintiff's supervisors micromanage Plaintiff's program, not affording her the freedom to use her education, experience, and judgment, which has resulted in Plaintiff having to work extra, unpaid hours in order to ensure students are adequately taken care of and can graduate, in an effort to push her out. This practice continues to present day;

251.   Defendant's efforts to attempt to push out Plaintiff were, in part, due to her age and constitutes a violation of the ADEA. Said violation was willful and entitles Plaintiff to liquidated damages.

252.    As a direct result of the unlawful conduct of Defendant, as set forth herein, Plaintiff has suffered loss of past and future wages and benefits, a detrimental job record, career damage and diminished career potential, garden variety emotional distress, and other nonpecuniary losses, all of a continuing and permanent nature.

WHEREFORE, Plaintiff seeks judgement in her favor and against Defendant, on Count IV of the Complaint, in an amount that is just and equitable under the circumstances, including, but not limited to, Plaintiff's actual damages, exemplary damages, injunctive relief, and for all costs, expenses, witness fees and expenses and attorneys' fees incurred herein, and for such other relief as this Court deems just and proper.

**COUNT V**
**Title IX, 20 U.S.C. § 1681 – Sex Discrimination/Harassment**
**(Hostile Educational Environment)**

253.    The foregoing paragraphs are incorporated as though fully set forth herein.

254.    Defendant does and has received federal financial assistance through Title IX during all relevant times mentioned herein.

255.    Accordingly, Defendant's entire operations are subject to the prohibition on sex discrimination under Title IX 20 U.S.C. § 1681(2)(A).

256.    Plaintiff was, and continues to be, harassed and subjected to humiliating and demeaning conduct at the hands of her supervisor, Dean Wiggins, based on her sex.

257.    The harassment and/or discrimination was and is so severe, pervasive, and objectively offensive that it and Defendant's failure to respond effectively constituted harassment/discrimination against Plaintiff on the basis of her sex.

258.    Further, Defendant's failure to follow their own discrimination and harassment policy, along with their interim "Draft" Title IX Policy, also constituted harassment/discrimination against Plaintiff on the basis of her sex.

259.    Defendant's officers with authority to take corrective measures had actual knowledge of the harassment/discrimination, actions and conduct of Wiggins.

260.    Despite having knowledge of the harassing, discriminatory and demeaning conduct on the basis of Plaintiff's sex, Defendant failed to take corrective measures.

261.    Defendant failed to remedy the hostile educational environment to which Plaintiff was exposed even after having notice of the harassment/discrimination which was occurring in its workplace.

262.    Any reasonable person would have felt that he or she was being subjected to a hostile educational environment due to Defendant's conduct in failing to effectively remedy the pervasive and severe sexual harassment/discrimination of which Plaintiff was exposed.

263.    Defendant acted with deliberate indifference to known acts of sexual harassment/discrimination toward Plaintiff.

264.    Defendant's acts and omissions constituted discrimination and indifference against Plaintiff on the basis of her sex.

WHEREFORE, Plaintiff seeks judgement in her favor and against Defendant, on Count V of the Complaint, in an amount that is just and equitable under the circumstances, including, but not limited to, Plaintiff's actual damages, exemplary damages, injunctive relief, and for all costs, expenses, witness fees and expenses and attorneys' fees incurred herein, and for such other relief as this Court deems just and proper.

## COUNT VI
## Title IX, 20 U.S.C. § 1681 – Retaliation

**(For Complaints Made to KCKCC)**

265.    The foregoing paragraphs are incorporated as though fully set forth herein.

266.    Defendant does and has received federal financial assistance through Title IX during all relevant times mentioned herein.

267.    Accordingly, Defendant's entire operations are subject to the prohibition on sex discrimination under Title IX 20 U.S.C. § 1681(2)(A).

268.    Plaintiff engaged in protected activities by complaining to the VPAA, BethAnn Krueger, Sean Burkett (Title IX Coordinator), VPAA, Jerry Pope, and directly to her supervisor, Cleon Wiggins about the harassment/discrimination and hostile work environment.

269.    Defendant retaliated against Plaintiff by not disciplining Wiggins, but instead, allowing Wiggins to write Plaintiff two letters of reprimand, forcing her to take sick leave, and allowing Wiggins to undermine the Program affecting Plaintiff's compensation.

270.    Defendant retaliated against Plaintiff by not following their own harassment/discrimination policy.

271.    Defendant retaliated against Plaintiff by not following their interim "Draft" Title IX Policy.

272.    Moreover, Defendant retaliated against Plaintiff by not following the retaliation provision within their policies, including the Discrimination and Harassment Policy and "Draft Title IX Policy.

273.    Defendant retaliated against Plaintiff by allowing Wiggins to deviate from the Contract adversely affecting Plaintiff and her contractual rights thereto.

274.    Defendant has intentionally retaliated against Plaintiff for complaining about the harassment/discrimination and participating in protected activities in violation of Title IX.

275.    As a direct result of Defendant's unlawful retaliation, Plaintiff has suffered damages, lost wages and garden variety emotional distress.

WHEREFORE, Plaintiff seeks judgement in her favor and against Defendant, on Count VI of the Complaint, in an amount that is just and equitable under the circumstances, including, but not limited to, Plaintiff's actual damages, exemplary damages, injunctive relief, and for all costs, expenses, witness fees and expenses and attorneys' fees incurred herein, and for such other relief as this Court deems just and proper.

## COUNT VII
## Title IX, 20 U.S.C. § 1681 – Retaliation (For Filing Lawsuit)

276.    The foregoing paragraphs are incorporated as though fully set forth herein.

277.    Defendant receives and has received federal financial assistance through Title IX during all relevant times mentioned herein.

278.    Accordingly, Defendant's entire operations are subject to the prohibition on sex discrimination under Title IX 20 U.S.C. § 1681(2)(A).

279.    Plaintiff engaged in protected activities by filing her first Compliant, pursuant to Title IX 20 U.S.C. § 1681 (alleging sex discrimination/harassment (hostile educational environment and retaliation), on September 3, 2021.

280.    Defendant retaliated against Plaintiff for filing her first Complaint by demoting her and stripping her of the coordinator title for which she has held for 29 years as an employee at KCKCC.

281.    Defendant retaliated against Plaintiff by not following its own Discrimination and Harassment Policy.

282.    Defendant retaliated against Plaintiff by not following its interim "Draft" Title IX Policy.

283.     Defendant has intentionally retaliated against Plaintiff for filing a Title IX Complaint regarding the harassment/discrimination and retaliation she is experiencing at KCKCC and participating in protected activities in violation of Title IX.

284.     As a direct result of Defendant's unlawful retaliation, Plaintiff has suffered damages, lost wages and garden variety emotional distress.

WHEREFORE, Plaintiff seeks judgement in her favor and against Defendant, on Count VII of the Complaint, in an amount that is just and equitable under the circumstances, including, but not limited to, Plaintiff's actual damages, exemplary damages, injunctive relief, and for all costs, expenses, witness fees and expenses and attorneys' fees incurred herein, and for such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all counts of this Complaint.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas, as the place of trial.

**DAVID R. SMITH P.C.**

By: /s/ David R. Smith
David R. Smith #39088
700 West 47th Street, Suite 550
Kansas City, Missouri 64112
Telephone: 816.753.9393
Facsimile: 816.778.0957
david@dsmith-law.com

**WEBSTER LAW, LLC**

By: /s/ Spencer J. Webster
Spencer J. Webster #70728
700 West 47th Street, Suite 550
Kansas City, Missouri 64112
Telephone: 816.384.2272

swebster@sjwebsterlaw.com


By: _/s/ Sophie Woodworth_____
Sophie Woodworth, KS  #21754
Holman Schiavone, LLC
4600 Madison Avenue, Suite 810
Kansas City, MO 64112
PHONE: 816-283-8738
swoodworth@hslawllc.com

**ATTORNEYS FOR PLAINTIFF**