Received in EEOC on 7-6-2022

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☐ EEOC | 563-2022-02518 |

and EEOC

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Date of Birth |
|---|---|
| Kathryn Lask | |

| Street Address | City, State and ZIP Code |
|---|---|
| 2606 W. 75th Street, Prairie Village, Kansas 66208 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| Board of Trustees of Kansas City Kansas Community College | 550+ | 913-334-1100 |

| Street Address | City, State and ZIP Code |
|---|---|
| 7250 State Ave, Kansas City, KS 66112 | |

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☒ AGE  ☒ DISABILITY  ☐ OTHER (Specify below)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: August 2018  Latest:
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See Exhibit A

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

**Attorney for Kathryn Lask**

7/6/22
Date — Charging Party Signature

NOTARY – When necessary for State or Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT  **Attorney for Kathryn Lask**

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

**Exhibit A**

Kathryn Lask is a white female, over the age of 40, that has been employed by Kansas City Kansas Community College ("KCKCC") from 1992 to present. Lask is a tenured professor at KCKCC and coordinator of the paralegal program. During the times mentioned herein, Lask has experienced harassment, discrimination and retaliation.

Lask currently coordinates the Paralegal Program, which is under the academic division of Social and Behavioral Sciences & Public Services (sometimes referred to as "Social Science Division"). At all times during her employment, because of her experience and education in law, Lask has been qualified to teach all Paralegal courses, Business Law I and II, and all law courses in the Criminal Justice program.

In May of 2018, because of reorganization of KCKCC, Lask learned that the Paralegal Program was being moved back to the Social Science Division from the Business Division.In August of 2018, Cleon Wiggins ("Wiggins") became Lask's supervisor as Dean of Social and Behavioral Sciences & Public Services. Upon information and belief, Wiggins does not have a Juris Doctor degree or any experience in the legal field.

In June of 2018, before Wiggins became Lask's supervisor, Lask initiated a meeting with Wiggins to discuss a plan of action because Lask had personal issues regarding challenges with picking up children as a single mom. Lask requested this meeting to explain her situation and assure Wiggins that she was committed to her work, but also to inform him there were some personal situations that she could not avoid. During this meeting, Wiggins was very kind and understanding and seemingly wanted to assist Lask in making sure she could effectively perform the duties of her job while allowing her to attend to her personal needs as a single mother. Additionally, Lask shared details of efforts already made toward effectuating potential changes to improve the Paralegal Program (sometimes referred to as the "Program") enrollment, including changes recommended by the Paralegal Advisory Board, to get Wiggins feedback and support; specifically, Lask suggested a new name for the Program as well as taking advantage of SB155's opportunities by offering classes in the local high schools. Wiggins acknowledged the recommendations in an email to Lask on June 20, 2018.

During the convocation meeting for the Spring 2019 semester, Lask learned of an emergency involving her youngest son and took leave to attend the emergency. Two weeks later, Lask was informed of another situation involving her middle child. Lask knew the challenges with her children would be continuing in nature and inquired with her Kansas National Education Association ("KNEA") union representative and the College Human Resources department ("HR") regarding her options with the Family Medical Leave Act or other leave to minimize her obligation on campus allowing her to give proper attention to her children. None of the leave options presented would allow Lask to continue getting paid during such leave time, and as a single mother, foregoing pay was not possible. Therefore, Lask informed her supervisor, Wiggins, she would likely be exercising paid leave on a more frequent basis but assured Wiggins that she was committed to her position at the College. Further, Lask disclosed extremely personal information regarding her children and the nature of the situation which would warrant her not spending extra time on campus for the foreseeable future.

**Assignment to Program Review Committee**

Approximately three weeks after this meeting and conversation with Wiggins, Wiggins assigned Lask to an additional committee on campus, the Program Review Committee. At the time Wiggins assigned Lask to the Program Review Committee, she was already involved with one campus committee that typically met once per month. The Program Review Committee held meetings on Wednesday afternoons at 2:30, one to two times per month for up to two hours. Unfortunately, 2:30 was the time Lask needed to leave to pick up her youngest son from school and Wiggins understood this. Moreover, the Program Review Committee was the only committee that reports attendance to the deans because most of the attendees are tech staff who are on duty during the duration of this committee meeting and otherwise would be working at their desks; as a faculty member, Lask's contractual time requirements are different and not hourly in nature.

Lask objected to being assigned to this specific committee and reminded Wiggins of their conversation and of her challenges at home which would require her to exercise more paid leave options; additionally, Lask inquired if there was another committee she could join that met at a time whereby she could still be available for childcare for her children. Regardless of Lask's objections and reasons thereto, Wiggins insisted that Lask sit on the Program Review Committee stating it would be good for her because the upcoming year required completion of a self-study from the Program.

Under the MASTER CONTRACT Between THE BOARD OF TRUSTEES Kansas City Kansas Community College and THE FACULTY ASSOCIATION OF KNEA Kansas City Kansas Community College (the "Contract"), committee meetings are not specifically required for faculty members, but Wiggins required Lask to attend regardless. Since such meetings are not required of faculty, if Lask could not attend the meeting, she could not take leave because no contractual leave applied. Knowing her obligations to her children, Lask met with the committee chairperson to explain the situation and the need for her to care for her child, and he assured her that she could review the minutes for the meetings and the minutes would be sufficient for any preparation for the self-study of the Program during the upcoming year. Lask attended the committee meeting infrequently but read the minutes and prepared the self-study for the Program and submitted it on time in May 2020. After Lask's submission of the self-study for the Program, which was the reason Wiggins told Lask she was to sit on the Program Review Committee, it was her understanding that her service to this committee was complete and therefore discontinued such service.

In October 2020, the Program self-study was peer reviewed via Zoom meeting and during the meeting Lask was present to engage in discussion and questioning. During the meeting, Lask was questioned regarding statements she made in the self-study specifying challenges with the Program and Lask responded that she was in need of administrative support to go forward with the advisory committee recommendations. Lask went on to explain that (1) she began discussing a plan for progressing the Program with her dean in June 2018 and that those discussions were continuing; (2) that she needed her dean's assistance in approving class offerings at the high school; and (3) she needed her dean's assistance to attain alignment with Kansas Board of Regents' (sometimes referred to as "KBOR") 60-credit hour recommendations for associate programs (which required

approval through the Academic Policies Committee), but had yet to receive such support or assistance. Unbeknownst to Lask, Wiggins was on the Zoom meeting the whole time.

At the subsequent coordinator and division meeting, Wiggins asserted that, while he was "not naming any names" of people who tried to blame lack of program success on him, those people would "not get the desired help" and "would not be happy" about the repercussions. Lask heard this statement as a veiled threat directed solely toward her.

In December 2020, Wiggins scheduled a disciplinary Zoom meeting to discuss Lask's failure to attend Program Review Committee meetings, claiming that she was being insubordinate by her failure to attend. Wiggins prepared a Letter of Reprimand to be placed in Lask's HR file for what he claimed to be insubordination. During the meeting Lask explained to Wiggins that it was her understanding that her service involving the Program Review Committee ended in May after she submitted her self-study for the Program. Additionally, Lask reminded Wiggins that she was willing to participate in other committees with different meeting times, that she had no intent of insubordination, and was fully intent on and committed to fulfilling her obligations under the Contract, which did not require her to sit on any committees.

Lask further inquired as to Wiggins' procedures for assigning faculty to committee assignments rather than allowing faculty to volunteer as was Lask's experience with all previous supervisors at KCKCC, and further inquired about other committee meeting times, and who else Wiggins had assigned to serve on committees, because, as to Lask's knowledge, no other coordinators in the division have been assigned committees. Wiggins responded that he wouldn't "go down that rabbit hole."

## Wiggins plan to move faculty offices.

In June of 2019, during summer break, Wiggins sent an email to faculty requesting feedback on his plan to move several faculty offices. As Lask had moved offices several times over the years and is one of the most senior faculty members on campus, and such seniority used to mean something before Wiggins became dean, Lask objected to the plan proposed and offered an alternative solution that achieved his stated objective. Wiggins refused to engage in discussion and asserted his plan was best.

A couple of months later, in August of 2019, Lask had a meeting with the now former Vice President for Academic Affairs ("VPAA"), BethAnn Krueger, whereby she discussed her issues with the office moves and relayed how Wiggins' behavior was creating a hostile environment in which Lask, as a female and single mother, felt singled out and targeted. Additionally, Lask told the VPAA that the proposed office move would place her office directly adjacent to Wiggins' office which made her uncomfortable and anxious as she believed such an office location would subject her to further discriminatory treatment by Wiggins.The VPAA said she would look into the situation but later followed-up by email suggesting Lask talk with HR and did nothing. Pursuant to the VPAA's suggestion, Lask scheduled a meeting with the faculty liaison and **Title IX Coordinator**, Sean Burkett, whereby she reported the hostile work environment to Sean Burkett, and again, nothing was done.

3

During the first week back on campus, Wiggins insisted that Lask pack up her office for the Fall 2019 semester. After Lask consulted her KNEA representative who assured Lask that Buildings and Grounds staff were the appropriate personnel to move the office, Lask packed up her personal belongings and went to a nearby common area on campus to make herself available to students during the move. Lask then received an email from Wiggins asserting that Lask did not have permission to work outside of her office, despite the fact the Contract does not specify where faculty members must spend their contracted hours and despite the fact that 182-faculty have had the freedom to move about campus as they please the entirety of Lask's career at KCKCC. Thereafter, in September of 2019, Wiggins scheduled a disciplinary meeting asserting that Lask was insubordinate by not packing up her office and went as far as presenting pictures of Lask's previous office with books on the shelves as evidence of such insubordination.

When office moves actually occurred, Wiggins arbitrarily moved a male faculty member from the same office suite as Lask into Lask's previous office, giving preferential treatment to the male faculty member, despite Lask having many more years of seniority. Lask had a KNEA representative, Ernie May, accompany her to the meeting and the representative informed Wiggins that faculty members are not hired to be movers and the Contract did not require or suggest faculty engage in such activity. Moreover, during this meeting Lask attempted to address the issues surrounding her attempt to communicate directly with Wiggins regarding various faculty obligations and efforts and how Lask felt the tone and substance of Wiggins emails came off hostile, harassing, discriminatory and caused her anxiety. Upon hearing Lask's feelings, Wiggins rose up out of his chair and demanded Lask show him the emails to which Lask replied that since he was on all of the email chains, he had access to the emails.

After this meeting, Lask's KNEA representative, who had witnessed the exchange between Wiggins and Lask, urged Lask to file a Title IX action, or at the very least, a grievance. Further, the KNEA representative suggested that several women in the Social Science division had reached out to him having the same or similar concerns as Lask regarding Wiggins disparate treatment against the women in the department. After this exchange with the KNEA representative, Lask considered taking such actions, but feared retaliation and increased threats from Wiggins.

### Class cancellations and coordinator issues.

In January 2019, Lask asked Wiggins to add the Internship I and II courses to the spring schedule to accommodate a paralegal student who needed the classes to graduate and recently found a sponsor for her internship. Wiggins objected to the student's concurrent enrollment in both internships, despite Lask explaining that the student's internship would be continuous with one sponsor and the student would be able to complete all required course hours. Wiggins refused to acknowledge Lask's previous, extensive experience and refused to consider the fact previous deans had all deferred to her education and experience and approved such a course.

All previous deans would regularly defer to Lask's expertise and experience as a practicing attorney and program coordinator who works directly with the students. Wiggins, with no legal education and/or experience, gave no actual, practical reason for not adding the course, but mentioned "policies" without referring to specific policies. Additionally, Wiggins stated a degree

4

audit must be completed before enrollment in internships, yet this has never been policy or practice in the past and Wiggins gave no reason as why it was necessary.

Wiggins does not behave in the same fashion with Lask's male counterparts and regularly defers to their education and experience, allowing them to run their programs as they see fit. Additionally, in 2019, Lask was scheduled to teach four 8-week courses for the Paralegal Program; two were to begin in January and two were to begin in March, after spring break. Even though the courses were experiencing low enrollment and in danger of being cancelled, after Lask's advocation for her students who were scheduled to graduate in May, Wiggins approved the courses to continue. As Lask was advocating for her students and Wiggins subsequently made the decision to approve the courses to continue, Lask explained to Wiggins that the students taking the first 8-week courses would also be taking the second 8-week course, therefore enrollment in the second 8-week courses would be low as well. Wiggins indicated he understood the second 8-week courses would not have additional enrollment. Yet, during spring break, when Lask was off duty, she received an email from Wiggins stating the second 8-week courses were going to be cancelled.

Lask, during her time off, replied to Wiggins by forwarding email communication from January whereupon Lask believed this situation had been resolved and reminded Wiggins that if the classes were cancelled the students would not graduate in May. Wiggins responded by inquiring if degree audits were on file for the students and after Lask's investigation, she discovered no audits were on file because the graduation check (when degree audits needed to completed) deadline was not until April.

Lask shared with Wiggins the graduation check deadline and he continued to insist that the courses would be cancelled without the "degree audit proof." Lask contacted an advising staff member (as staff members do not have a scheduled spring break like faculty) to see if she could prepare degree audits for the students as Lask was on spring break in Florida. As it turns out, the staff member was on vacation that week as well, so Lask having no other choice to advocate for her students, prepared the degree audits herself, sent them to Wiggins and renewed her request he not cancel the courses.Upon receiving the degree audits evidencing the students' May graduation date and Lask's renewed request, Wiggins still cancelled the courses within days of them set to begin.

Lask continued to request Wiggins reinstate the courses, especially after receiving panicked emails from the students about not being able to graduate. Wiggins initially refused but required the advising staff member to send him the same degree audit documentation showing the students' expected May graduation as Lask had previously sent him. Prior to Wiggins requiring the information from the advising staff member, Wiggins had never requested the advising staff member get involved; Lask requested her assistance because Lask was on vacation. Wiggins basically used the advising staff member, who has no supervisory authority over Lask or the Paralegal Program, to check and affirm Lask's work. Only after the advising staff member checked and affirmed Lask's work did Wiggins reinstate the courses allowing the students to graduate in May.

After this situation, Lask scheduled a meeting with Wiggins to discuss his objective and rationale for cancelling the courses despite her producing the requested documentation to him during spring

5

break. Wiggins responded by insisting Lask agree there "had never been a problem between us, Kathryn" and that "I probably should have just called you. I'm not really good at email."

Additionally, Lask scheduled another meeting with the faculty liaison in Human Resources to discuss the multiple problems Wiggins was presenting. The Human Resources staff member suggested there were simple miscommunication issues and Wiggins had done this several times. The Human Resources staff member dismissed Lask's concerns that Wiggins' behavior was problematic, and that Wiggins was creating a hostile work environment for female faculty in the Social Science division. Instead of investigating, the HR staff member dismissed any type of wrongdoing alleged by Lask, who, in all her years being employed by KCKCC has never reported sexual harassment and/or discrimination against another employee

In the Spring of 2020, a similar situation occurred with internship courses. Students found internships at the beginning of the semester, but Wiggins claimed it was too late to add them to the full semester classes. Yet, Wiggins has the ***discretion*** to add the students to the full semester classes. Instead, Wiggins agreed to add the courses to the second 8-week term starting March; yet, in March, he ***cancelled*** the internships for low enrollment. Wiggins continues to cancel the internships, which only serves to damage Lask as she is paid ***per student*** and there is ***no minimum*** enrollment in internships.Now, Wiggins argued that the students shouldn't be enrolled in both internships despite having agreed to the same situation with the students in January. Wiggins refused to even engage in further conversation regarding this issue and both his and the preceding deans' previous practice.

Wiggins continues to undermine Lask's position as the Paralegal Program coordinator and her relationships with the students. Additionally, Wiggins refuses to engage in discussion and instead, becomes loud, demanding, and standoffish. Furthermore, in the Spring of 2020, Wiggins objected to Lask's class offerings, again, with no legal background or experience. Yet, Wiggins never questions male colleague's expertise and experience in deciding and planning which classes to offer.

### Assigning night classes.

In the Fall of 2019, Wiggins required Lask to schedule a night class even though paralegal night classes have not made minimum enrollment since the early 2000's. Lask complied with the request and scheduled a night class naming a previous paralegal adjunct instructor as the instructor for the night class. Wiggins objected to the adjunct being named the instructor and informed Lask that she needed to post the job. Again, Lask complied with Wiggins' request only to have Wiggins object to the job requirements posted with no explanation. Lask repeatedly asked for direction, was not given any, and was eventually assigned to instruct the course by Wiggins. Lask again reminded Wiggins of her family obligations as a single mother and stated that she was unable to teach a night class; Lask even forward Wiggins the communication regarding the adjunct request. Wiggins failed to even respond to Lask, ignoring her requests and obligations as a single mother.

### Wiggins' affirmative efforts to discourage and halt Program improvements and proposed changes to comply with KBOR recommendations.

6

Additionally, in the Fall of 2019, Lask was voicing her frustration stemming from the lack of assistance from Wiggins regarding: (1) moving forward with getting the Paralegal Program into area high schools to take advantage of SB 155 provisions that would push more traditional students into the Program; and (2) moving forward with the changes to the Program to make it more accessible with respect to course offerings as well as to comply with KBOR recommendations to have 60 maximum credit hours for Associate Degrees as the Program was no closer to achieving either objective than when Lask first mentioned the objectives to Wiggins in June 0f 2018.As Lask voiced such frustrations, a male colleague, who is also in the Social Science division and sits on the Academic Policies Committee ("APC") informed Lask she could ask Wiggins to present the changes to the Dean's Council so that Lask could in turn present them to APC for advice. The behavior displayed at division meetings made clear that the male colleague and Wiggins had a very friendly and professional relationship and when the male colleague requested Wiggins present changes to his program to the Dean's Council, Wiggins willingly obliged.

Lask subsequently had in informal presentation at the APC and was given advice and direction on how to proceed with her proposed changes. Moreover, Lask discussed the changes with the Paralegal Advisory Board, but because of the challenges surrounding COVID, a formal presentation to the APC was not possible until October of 2020. As October of 2020 approached, procedure required Wiggins present the changes to the Dean's Council before Lask could make a formal presentation to the APC. Despite willingly agreeing to the male colleague's request on Lask's behalf for APC review of her changes to the Program just a year prior, Wiggins refused to present Lask's proposed changes to the Dean's Council, stating in an email that he did not agree with the changes despite his complete lack of any legal education or experience and Lask's accompanying support of the Paralegal Advisory Board and their agreement with such changes. Wiggins further asserted that he had never been made aware of Lask's desire to make changes, yet Wiggins and Lask had a conversation regarding such changes in June 2018 and Wiggins engaged in email communication with Lask regarding such changes beginning in February 2019 continuing through the fall of 2019.

### Refusal to honor law degree, teaching qualifications, teaching experience, previous practice, HLC policies, and the Contract

Again, in August 2019, one week before the semester began, course cancellations caused Lask to be short of the required contractual teaching load under the Contract. The Contract provides for any full-time faculty member (Lask) short on their teaching load to request to teach a course slated to be taught by an adjunct to meet the contractual required load. After consultation with the now former Criminal Justice Program Coordinator, Kevin Steele, Lask requested Wiggins assign her courses within the Criminal Justice department for which she is qualified to teach, and which adjunct faculty were assigned. Wiggins refused to allow her to teach courses for which she was qualified and had taught before stating the Criminal Justice Program Coordinator was required to "make contractual load" before Lask could request any classes within that program.

Wiggins' statement does not align with the Contract nor is it factually correct as Mr. Steele was employed as a 212-faculty[1] member and did not have contractual load requirements whereas Lask,

---

[1] 212-faculty are have hours in which they are required to be campus at their work space, whereas, 182-faculty do not have the same requirements.

7

employed as a 182 faculty member is contractually required to teach 30 credit hours per year. Lask subsequently alerted her KNEA representative of Wiggins' statements and actions and included the VPAA of the discriminatory behavior by copying her on an email chain whereupon Lask renewed her request to add the Criminal Justice courses to her teaching schedule pursuant to the Contract. Lask was assigned the requested courses with no further communication from Wiggins.

In the Spring of 2020, Lask again taught Criminal Justice courses at Wiggins' request as the Criminal Justice Coordinator resigned and Lask was qualified to teach such courses. In the Fall of 2020, Lask again needed to pick up courses to meet her contractual load and requested to teach Criminal Justice courses again, as she has done her entire career at KCKCC.But, in the Fall of 2020, with a new Criminal Justice Coordinator who lacked tenure, Wiggins emailed Lask with a new assertion that Lask was not qualified to teach Criminal Justice courses, claiming she did not meet the Higher Learning Commission's ("HLC") qualifications and supplied a lengthy analysis and explanation attacking her doctorate degree transcript and previous experience[2], concluding that Lask's education and experience did not support her being qualified to teach such courses[3].

Prior to the aforementioned email, there was no discussion and/or inquiry from Wiggins regarding Lask's qualifications. The HLC policy statement cited by Wiggins states a faculty member is considered qualified to teach if the faculty member holds a "relevant" or "related" degree at least two degrees higher than the course being taught; so, a faculty member holding a doctorate may teach bachelor's degree courses or below. Thus, there is no need to do extensive research or evaluation on Lask's transcript as she holds a juris doctor, a doctorate degree in law, which is both related and relevant to Criminal Justice.

As such, Lask replied to Wiggins' email objecting to the evaluation, citing the HLC policy and explaining why she is and always has been qualified to teach Criminal Justice courses. Lask copied the VPAA on her reply asserting objections yet nothing was done or said about the incorrect evaluation of Lask's qualifications.Further, Wiggins claims that because her law school transcript did not reveal any Criminal Justice courses, she was not qualified. Lask's law school transcript did however reveal that she took and passed Criminal Law and Criminal Procedure, but Wiggins did not see these courses as "relevant" or "related" because they are not "criminal justice" courses. Oddly, Lask's law school transcript is devoid of any paralegal courses, but Wiggins never questioned her qualification for teaching those courses.

Lask objected multiple times to the notion she was not qualified as she's been teaching those courses for decades. In response to the incorrect evaluation, Lask contacted her KNEA representative who reassured her that Wiggins claim she was not qualified to teach Criminal Justice courses was incorrect. Lask then scheduled a meeting with the interim VPAA, Jerry Pope, in hopes of obtaining support for enforcing the Contract and having her qualification to teach evaluated correctly. Prior to the meeting with Mr. Pope, Lask spoke with the new coordinator of the Criminal Justice Program and inquired as to if she would add Lask's names to the courses and she agreed to tell Wiggins that Lask could teach the requested Criminal Justice courses.

---

[2] Wiggins only used Lask's experience from 2018 forward in his evaluation, despite the fact Lask has been employed by and teaching at KCKCC since 1992.

[3] The specific classes Lask was requesting to teach, while Criminal Justice courses, are more related to law and legal theory rather than corrections.

During the meeting, the interim VPAA stated he would speak with the new coordinator about the issue, but no further communication was had and Lask was not assigned the requested courses. In January of 2021, Lask emailed Wiggins renewing her objections to his evaluation of her qualifications and attached a discovered document prepared by Ed Kremer, PH.D., a previous dean of Lask, in anticipation of an upcoming HLC campus visit for continuing accreditation. The document specifically stated that Lask holds a Doctorate degree in law and as such is qualified to teach all law classes at KCKCC[4], including classes in the Paralegal Program, Business Law I and II, and Criminal Justice courses. As further support for her qualifications, Lask mentioned the two previous Coordinators of the Criminal Justice Program continuously requested Lask to teach courses in their program throughout tenure and would not have done so if they believed Lask was unqualified. Wiggins replied that the HLC document prepared by Dr. Kremer was not helpful or dispositive regarding Lask's qualifications and further claimed that the previous coordinate, Mr. Steele, who continuously requested that Lask teach Criminal Justice courses, did not believe Lask was qualified. Interestingly, Mr. Steele held bachelor's degree in Public Administration and Political Science and a Master of Public Administration, not Criminal Justice, but Wiggins never conducted an evaluation of his education and experience to decide whether he was qualified to teach certain courses; instead, Wiggins just assumed Mr. Steele was qualified.

### **Discriminatory treatment regarding discretionary decisions.**

In August of 2021, the week prior to faculty return, the President of KCKCC communicated updated COVID protocols for the entire campus.  With such protocols in place, Lask made a doctor's appointment to document a medical condition and request an accommodation from the HR department. Additionally, the President sent a Convocation/Welcome back agenda for the first week 182-faculty was to start work for the fall semester and the agenda showed all meetings for the week were being conducted virtually via Zoom or Teams. There was no mention of a requirement regarding where faculty were expected to attend the virtual meetings, as in previous semesters during COVID, and there was no communication from the division dean (Wiggins) regarding expectations that faculty be on campus during the week before classes. As such, Lask believed there was still a desire to minimize personnel on campus, as evidenced by all meetings being conducted virtually and as had been the status quo since late spring 2020.

On Wednesday, August 11, 2021, Wiggins communicated with Lask that he expected her to be on campus. Lask replied that she was waiting on a document from her doctor regarding an accommodation. But, because of Wiggins' communication, Lask submitted sick leave requests for all her contracted time she could not prove attendance via Zoom sign in. Wiggins refused to accept Lask's sick leave, instead challenging her submission and accusing her of using the time inappropriately and against sick leave policy, specifically claiming she was trying to account for the time she wasn't on campus rather than actually being sick. Lask replied to Wiggins clarifying that she used her sick leave as she was waiting on medical documentation for her medical accommodation and she copied HR on that email to ensure HR would have notice of Wiggins' behavior singling Lask out and harassing her. Wiggins replied, only to Lask, leaving HR off the reply email, that he had already prepared a Letter of Reprimand, that HR had signed off on the

---

[4] KCKCC is a community college for which the highest degree conferred is an associates degree.

letter, and Lask was directed to schedule a meeting during the week of August 23, 2021, to discuss the letter.

Lask spoke with other 182-faculty in her department, none of which received direction regarding on-campus requirements from Wiggins or from administration. Additionally, none of the faculty in her division with whom she spoke were contacted by Wiggins regarding whether or not they were on campus. Furthermore, the 182-faculty members with whom Lask spoke to stated they were working from home as further evidenced by their Zoom screen.

Lask attended a meeting to discuss the Letter of Reprimand on September 1, 2021, and when asked by Lask's KNEA representative if Wiggins had inquired into other employees whereabouts, Wiggins replied that he did not go looking to see of other employees were on campus. Lask was issued the Letter of Reprimand, which again, stated that she had been insubordinate. Notably, insubordination is one of very few ways to terminate a faculty member as faculty are well protected under the Contract from being arbitrarily terminated. Wiggins has now issued Lask two Letters of Reprimand, neither of which involved clear policy or Contract violations, citing insubordination. Wiggins has never been disciplined for his sexual harassment/discrimination or his retaliation against Lask. KCKCC's actions, including but not limited to its actions through Wiggins, have impaired Lask's ability to progress the Program and continue advancing in her career as a professor at KCKCC.

### Continued harassment through the HR Department of KCKCC.

On August 27, 2021, Lask received an email from Christina McGee, Chief Human Resources Officer of KCKCC, in which Ms. McGee stated: "***It was brought to the attention of the HR Department*** that your name and the College's address shows up on the Legal Directories website. I am not certain if a third party added the College's address of if this is updated by you. ***It has been requested*** that the College's address be changed to a personal or business address under your name. If possible, will you update the profile by removing the College's address?" Beginning in 1992, when Lask began working for KCKCC, she has been a licensed attorney and her address on file with the State Bar of Kansas has been KCKCC. Additionally, the email makes clear that the HR Department did not seek out this information, but that someone had reported such information to the HR Department. Furthermore, the email makes clear that it is not the HR Department requesting the address be changed on the Legal Directories website, but that the individual who reported the address to the HR Department in the first place also requested it be removed.

It is clear someone was searching into Lask attempting to find unfavorable information because if her listing KCKCC's address was truly an issue, it would have been requested that Lask remove KCKCC's address from the State Bar of Kansas' website as well as AVVO's website (another legal directory). Lask has maintained her status as a licensed attorney for the benefit of KCKCC and prior to August 27, 2021, there has never been an issue with KCKCC's address being listed next to Lask's status as a licensed attorney. Moreover, Lask can be found on KCKCC's website under the Faculty and Staff Directory. Importantly, nearly every faculty and staff member listed on KCKCC's website can be found on a third-party website, such as zoom info, with KCKCC's address associated with them; this includes Christina McGee.

### Retaliation after filing her Complaint.

10

On September 3, 2021, Lask filed her first Complaint, pursuant to Title IX, 20 U.S.C. § 1681, for sex discrimination/harassment (hostile educational environment) and retaliation. KCKCC was served on September 3, 2021; and thus, were put on notice of Lask's claims under Title IX on the same date.

On September 8, 2021, five days after Defendant was served and placed on notice, Wiggins required Lask to attend a Zoom meeting. In that Zoom meeting, Wiggins informed Lask that she was being demoted, stripped of her coordinator title, a title for which Lask has had for **29 YEARS** as a professor at KCKCC. Wiggins stated that Lask's demotion and stripping of her coordinator title took effect immediately. Further, Wiggins informed Lask that her Program would be placed under the Criminal Justice Program, and that she would now be supervised by the coordinator with the least amount of experience/time in the Social Science Division and who is not tenured. Wiggins stated the reason for her demotion was that the change would be "better for students", yet Wiggins has a pattern of attempting to keep Lask's students from graduating for arbitrary reasons, or no reason at all.

When Lask asked Wiggins how students would better be served by this change, or what about her performance makes this change better for students, he again replied with his common response that he would not go "down that rabbit hole." Notably, Wiggins indicated that Lask's job duties would not change, but nonetheless, effective immediately, she would no longer adorn the title of coordinator. Lask was the only vocational coordinator in the Social Science Division who was demoted and stripped of her coordinator title.

Since filing her Complaint, Lask continues to be subjected to discrimination, harassment and retaliation. KCKCC refuses to follow their policies and procedures regarding Title IX complaints in that they have refused to engage in discussion regarding how to support Lask. Moreover, Lask's office is still within the same pod as Wiggins. Because KCKCC has not offered Lask support or given her a new supervisor, she is not afforded the same benefits and support regarding her paralegal program as communication with Wiggins has diminished greatly. Moreover, because of the tension in the division, she is not afforded the same benefits and support from other faculty members. Additionally, she is not afforded the same benefits and support because she does not feel comfortable using her office, therefore, she has to roam the campus and find different places to work.

Kathryn Lask believes all the above is illegal harassment, discrimination and retaliation. Moreover, the harassment, discrimination and retaliation continues.

Attorneys for Kathryn Lask

**DAVID R. SMITH, P.C.**
David R. Smith, No. 13664
david@dsmith-law.com
4310 Madison Avenue, Suite 100
Kansas City, Missouri 64111
(816) 753-9393
Facsimile (816) 778-0957

**WEBSTER LAW, LLC**
Spencer J. Webster
swebster@sjwebsterlaw.com
4310 Madison Ave., Suite 100
Kansas City, Missouri 64111
(816) 384-2272

12